## Graves Ice Cream Co. v. Rudolph W. Wurlitzer Co.

(Decided Jan. 15, 1937.)

FISHER, BARRICKMAN, WATKINS & SEIDMAN for appellant.

TRABUE, DOOLAN, HELM & HELM for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

Both appellant, Graves Ice Cream Company, and appellee, Rudolph W. Wurlitzer Company, are corporations. The former was plaintiff and the latter was defendant below, and they will be so referred to in this opinion. Plaintiff by its action filed in the Jefferson circuit court sought to recover from defendant judgment for $1,975 for alleged damages proximately result-

ing from a breach of an alleged implied warranty made by defendant in the sale to plaintiff of certain machinery to be used in its ice cream manufacturing plant located in the city of Louisville, Ky. There was a written contract for the sale of the machinery by defendant to plaintiff, a copy of which was filed as an exhibit with the petition, and the court sustained demurrers filed to the petition and to it as amended, and plaintiff, declining to plead further, its action was dismissed, to reverse which it prosecutes this appeal.

The written contract was made April 22, 1933, and by it defendant sold to plaintiff and agreed to install in its plant, and connect it up with its theretofore installed equipment, a Condensing Unit, which it did, but with the results hereinafter stated. The language embodying defendant's proposition to plaintiff, and which it accepted, was that it (defendant) agreed to furnish or sell to plaintiff and install in its premises one "7½ H. P. Mohawk Condensing Unit connected to the present ammonia coils in your two ice cream hardening rooms and including all necessary expansion valves, ammonia valves, methyl-chloride valves, scale traps, and automatic starting switch on your water pump motor, completely installed ready to operate." The terms were that plaintiff would pay defendant upon the installation $145 and execute to it fourteen notes for $85.72 each, payable monthly thereafter. Then followed this language: "This proposal shall become a contract when signed by the Purchaser and accepted by the Seller and when so accepted constitutes a binding contract which covers *all* agreements and promises expressed *or implied* between the Purchaser and Seller. Acceptance by the Seller shall be valid only when made in writing on this contract by a duly authorized officer of the Seller." (Our italics.)

On the back thereof there were these express stipulations, excluding signatures: "The Rudolph Wurlitzer Company hereby guarantees the Mohawk Refrigeration Equipment specified on the face hereof to refrigerate your two ice cream hardening rooms to a temperature not higher than minus 5 degrees F' and to harden 700 gallons of ice cream per day under ordinary careful usage. In the event the Mohawk Equipment specified should prove insufficient to meet your refrigeration re-

quirements as qualified above, The Rudolph Wurlitzer Company hereby agrees to install any needed additional Mohawk Refrigerator Equipment without charge to you. If, within 30 days after date of completion of the installation of the Mohawk Equipment specified on the face hereof, the installation of connecting the Mohawk Condensing Unit to the *present* coils in your hardening rooms should prove unsatisfactory, or if the Mohawk Equipment should fail to meet your refrigeration requirements as qualified above, the Rudolph Wurlitzer Company hereby agrees to remove its equipment and refund all moneys paid to it by you."

The original petition alleged that the purchased Mohawk Condensing Unit from defendant was to be operated with methyl-chloride gas; whilst the old machinery (which that unit substituted in its connection with the necessary coils and other equipment that plaintiff did not agree to substitute) was operated with ammonia and which was known to both parties when the written contract sued on was entered into. It was further averred that the results obtained from the operation of the plant after the installation of the Mohawk Condensing Unit purchased of defendant were not as anticipated or as the contract stipulated, and that within thirty days after the installation defendant was notified but failed to remedy the defects and later disconnected and removed the Condensing Unit from the other equipment of plaintiff and refunded to it the $145 down payment; that it then purchased another unit from another company, but which was operated with ammonia; that defendant negligently connected the Condensing Unit that it sold to plaintiff with the coils and other permanent equipment of plaintiff, and it also was negligent in disconnectng it therefrom, whereby plaintiff was damaged in the sum of $1,400. The remaining portion of the judgment sought was made up of extra items of expense incurred on account of the failure of the purchased Condensing Unit to operate.

The alleged negligence so relied on consisted in these facts: That the methyl-chloride gas to be used in connection with the operation of the Mohawk Condensing Unit was allowed to become mixed with the remnants of ammonia in plaintiff's coils (with which defendant had nothing to do under its contract) and to thereby,

by chemical operation, produce a consolidated or thickened mixture that obstructed the valves in the coils and which should be cleaned out before successful operation could be obtained, and such condition was charged to have resulted from defendant's negligence, which is another method for charging that it failed to perform a duty that it owed to plaintiff.

It will be observed that plaintiff relies on an *implied* warranty that the machinery sold to plaintiff by defendant was suitable for the purpose for which it was purchased, and which proposition of law, in the abstract, is universally upheld and enforced; but long before the enactment of our Uniform Sales Act in 1928 (now sec. 2651b-1 to an including 2651b-78 of Baldwin's 1936 Revision of Carroll's Kentucky Stats.), the principle was approved by courts that it was competent for the parties to expressly stipulate against an *implied* warranty, and to confine their obligations to the specific terms of the contract if they saw proper, but which confining stipulation should be plainly expressed. Our Uniform Sales Act legislates upon the entire field of sales of personal property, including situations such as are here presented, and its provisions necessarily supersede any declaration that may have been made by us or any other court with reference to the applicable principles of law that should govern our determination of the right of the parties under the facts of this case.

Section 2651b-15 of the act says in part: "Subject to the provisions of this act or any statute in that behalf, there is no implied warranty or condition as to quality or fitness for any particular purpose of goods supplied under a contract to sell or a sale, except as follows: (1) Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be reasonably fit for such purpose." Further along and in subdivision (4) of the same section it is stated: "In the case of a contract to sell or a sale of a specified article under its patent or other trade name, there is no implied warranty as to its fitness for any particular purpose." Subdivision (6) of the same section says: "An express warranty or condition does not negative a warranty or

condition implied under this act *unless inconsistent therewith.''* (Our italics.)

Section 2651b-71 of the same Uniform Sales Act in legislating upon interpretative rules for its application says: ''Where any right, duty or liability would arise under a contract to sell or a sale by implication of law, it may be negatived or varied by express agreement or by course of dealing between the parties, or by custom, if the custom be such as to bind both parties to the contract of the sale.''

It was and is the contention of defendant's counsel that the above-inserted terms of the written contract herein brought the case within the provisions of the last-inserted section of the statute, and that when the contract said that its terms ''covers all agreements and promises expressed or implied between the Purchaser and Seller,'' it operated to negative the implied warranty relied on by plaintiff, as is expressly provided for by the inserted section 2651b-71. The court in sustaining the demurrers filed by defendant no doubt adopted that view but which the record does not disclose, since there was no written opinion.

Learned counsel for plaintiff in combatting that interpretation cite and rely on other provisions of the statute, and on these domestic cases: Balfour-Guthrie & Co. v. L. S. Du Bois Son & Co., 245 Ky. 640, 54 S. W. (2d) 13; J. B. Colt Company v. Asher et al., 239 Ky. 235, 39 S. W. (2d) 263; Day Pulverizer Company v. Ruthledge, 238 Ky. 817, 38 S. W. (2d) 949; John S. Noel Company v. Theobald, 217 Ky. 28, 288 S. W. 1031, and International Harvester Company of America v. Bean, 159 Ky. 842, 169 S. W. 549. They also cite two foreign cases and the text in 24 R. C. L. 204, sec. 475—all of which citations we have carefully read and in none of them is found the qualifying interpretation contained in section 2751b-71, supra; but which, as will be seen, is a statutory indorsement of the principle that it is competent for the parties to exclude by express language any implied warranty, and to confine the rights of the parties to the one expressed in the contract, and which interpretation is upheld, either expressly or by implication, in the cases relied on by defendant's counsel, which are: Twin City Creamery Co. v. Godfrey, 176 Mich. 109, 142 N. W. 362, 50 L. R. A. (N. S.) 805; Park

v. Richardson, etc., Co., 81 Wis. 399, 51 N. W. 572; Mc-
Cormick Harvesting Mach. Co. v. Brown, 5 Neb. Unof.
356, 98 N. W. 697. Some of them, including the domestic
ones, supra, may have been rendered before the enact-
ment of a Uniform Sales Act, but all of them establish
the applicable principle of law and the correct rules of
interpretation in the absence of such an act. When its
terms after its enactment approve such interpretative
principle, then the rule as so previously announced re-
mains unmodified by the statute and should be followed
by the court. We do not feel it incumbent on us to
devote either time or space in setting out the facts of
each of the cases relied on by the respective parties or
to specifically point out the correctness of the conclu-
sions reached by the courts rendering them, since that
information may be gathered by the reader consulting
the cases. It is sufficient for our purpose to state that
the above conclusions with reference thereto is undoubt-
edly correct. That being true, our remaining task is to
apply that interpretation to the facts of this case.

The violations of the contract as set out in the origi-
nal petition are clearly excluded from consideration
under our interpretation supra. But it is strenuously
argued by plaintiff's counsel that the alleged negligence
set out in the amended petition is not embraced by such
interpretative rule and that the court erred in sustain-
ing the demurrer to the amended petition, or to the peti-
tion as so amended. However, in making that contention
counsel appear to overlook the fact that negligence—as
hereinbefore stated—is but the violation of some duty
on the part of the one charged with committing it. That
duty may arise in various ways, one of which is by
contract, and it is the only way in which it could arise
in this case, since the relation of the parties are strictly
contractual. It was agreed by defendant in this case
only to connect its Mohawk Condensing Unit "to the
present ammonia coils in your (plaintiff's) two ice
cream hardening rooms." It is not averred anywhere
in plaintiff's pleading that the proper connection was
not made. Plaintiff was informed by the very terms of
the contract that the Condensing Unit so agreed to be
installed would operate with methyl-chloride gas. It
also knew that its former machinery had operated with
ammonia passing through the same coils. Nowhere in
the contract did defendant agree in any manner to

inspect or supervise the coils that plaintiff had in its plant and to which it agreed to connect its Condensing Unit, so as to ascertain whether or not such permanently installed apparatus was or was not in proper condition. Under the terms of the contract it was no more under obligation to remove any remaining substance in the coils than it was to supply defective and worn-out coil with new material. It would therefore appear that it was no contractual duty that defendant violated which brought about the conditions complained of in plaintiff's petition and amended petition.

If, however, we should be mistaken in that interpretation (but which we are convinced we are not), then the above-inserted section (2751b-71) is defensively applicable in view of the fact of the express stipulation in its contract that it "covers all agreements and promises expressed or implied between the Purchaser and the Seller." That language had the effect to negative any implied warranty arising from the contract. Moreover, the stipulation on the back of the contract whereby defendant in case of unsatisfactory service by reason of the connections of the Condensing Unit with the "*present* coils in your hardening rooms," agreed "to remove its equipment and refund all moneys paid to it by you," furnished the exclusive remedy. Defendant followed that remedy by disconnecting and removing its Condensing Unit and returning to plaintiff all payments it had made and which compliance was accepted by plaintiff. The contractual rescission having been executed by mutual consent terminated the rights of the parties under their restricted written contract. See section 2651b-69 of our Statutes, supra.

It will be observed that the conclusions above expressed are based specifically on the terms of the written contract, none of which are disputed or in any wise questioned by plaintiff. Without such determinative facts a different conclusion might be reached; but that is what makes one case different from another, and which sometimes confuses members of the bar as well as in some instances also courts, whereby an opinion is erroneously interpreted as fitting the case in hand, when if the differentiating facts were observed it would be clearly found to be otherwise.

Having so concluded, it follows that the court prop-

erly sustained the demurrer to plaintiff's pleadings, and likewise properly dismissed its action upon its failure to plead further, and for which reason the judgment should be, and it is, affirmed.